**MERCHANT & EVANS, INC.**

v.

**ROOSEVELT BUILDING PRODUCTS CO., INC.**

**Civ. A. No. 90–7973.**

United States District Court, E.D. Pennsylvania.

Aug. 16, 1991.

As Amended Oct. 4, 1991.

Steven R. Waxman, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for plaintiff.

Robert W. Hayes, Cozen and O'Connor, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW AND ORDER

HUTTON, District Judge.

Plaintiff brings this action in four counts. Count I of the amended complaint is brought under § 43(a) of the Lanham Trademark Act of 1946, as amended, 15 U.S.C. § 1125. This section of the Lanham Act creates a cause of action for false designation of origin. Count II asserts a claim of trademark infringement pursuant to § 32(1) of the Lanham Act, 15 U.S.C. § 1114. Count III alleges a common law claim of improper use of trade secrets. Count IV avers non-privileged imitation proscribed under New Jersey common law.

Plaintiff seeks a preliminary injunction restraining the defendant from using the asserted trade dress in the manufacture of the defendant's product and sales material; from using certain drawings and photographs which plaintiff avers are depictions of plaintiff's product; and from using a logo which plaintiff alleges infringes the plaintiff's trademark.

Jurisdiction in this action is predicated upon the Lanham Act, 15 U.S.C. § 1121 pursuant to 28 U.S.C. § 1331, and the diversity jurisdiction of the Court pursuant to 28 U.S.C. § 1332, in that this action involves citizens of different states and the amount in controversy, excluding interest and costs, exceeds $50,000; and the supplemental jurisdiction of the Court.

Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) in that defendant has transacted or conducted business here, and the causes of action, in part, arose in this district.

A hearing having been held, the Court makes the following:

## FINDINGS OF FACT

1. Plaintiff, Merchant & Evans, Inc. ("Merchant & Evans"), is a New Jersey corporation with a principle place of business located at 100 Connecticut Drive, Burlington, New Jersey. Merchant & Evans conducts business in Pennsylvania and other states.

2. Merchant & Evans manufactures and sells a long-length, concealed fastener, metal roofing system (referred to herein as a "standing seam roof system") which is marketed under the registered trademark of, "Zip–Rib." The roofing system features panels which are fused together by using opposing pressure rollers in a device referred to as a zippering machine.

3. Merchant & Evans licenses the Zip–Rib mark and product to George D. Widman, Inc., which is the exclusive manufacturer and distributor of Zip–Rib products in 13 states in the Western United States.

4. Defendant, Roosevelt Building Products ("Roosevelt") was founded by Roosevelt Morin ("Morin") in 1984.

5. In 1987, Roosevelt began manufacturing metal wall and roof panels.

6. Roosevelt markets its products throughout the United States and in foreign countries.

7. Roosevelt was formerly known as Cold Form Industries. In August, 1990, Cold Form Industries notified the marketplace that it had changed its name to Roosevelt Building Products. At the same time, Roosevelt adopted a stylized "Z" logo on all of its company letterhead.

*The Roofing Seam Profile*

8. Since at least 1965, the identical roofing seam profile configuration has been used continuously in connection with the Zip–Rib roofing system. Over the period of its exclusive use, Merchant & Evans has used a variety of promotional and advertising materials.

9. Patent No. 3,312,028, was issued on April 4, 1967 to Kaiser Aluminum & Chemical Corporation as the assignor of the invention. The patent expired on April 4, 1984.

10. The patent did not specify a precise shape for the standing seam profile. Instead, the patent described the seam profile as "tubular, or other nestable equivalent."

11. The advertising literature produced by Merchant & Evans in connection with the standing seam roofing system suggests that, overall, the standing seam serves a variety of utilitarian and aesthetic purposes.

12. The advertisements do not ascribe a purpose specifically to the profile of the standing seam.

13. The standing seam profile used by Merchant & Evans is instantaneously identified on sight by knowledgeable observers as a "Zip–Rib" roof.

14. Although there are over 100 manufacturers of metal roofs, the Zip–Rib Trade Dress is unique and distinctive, and readily distinguished from all other metal roofs.

15. By virtue of more than 25 years of usage, large sales volume, excellent performance and a unique and distinctive configuration the Zip–Rib Trade Dress has acquired secondary meaning as identifying Merchant & Evans as the owner of the Zip–Rib Trade Dress. No other manufacturer of standing seam roofs, other than Roosevelt and Merchant & Evans sole licensee, uses the Trade Dress configuration in its product.

16. Since this lawsuit was filed, Roosevelt has begun offering for sale the CF12SS, CF16SS, CF18SS and CF24SS roofing systems which are virtually indistinguishable from the Zip–Rib panels.

17. Due to the visual similarity of the two products, the Roosevelt roofing panel cannot be distinguished from the Zip–Rib product by a person observing the products, even at a close distance.

18. Defendant intentionally copied the standing seam profile of plaintiff's product.

19. The defendant's standing seam profile is one of over seventy-five (75) seam profiles sold by the defendant.

20. The plaintiff sells twelve (12) different seam profiles.

*The BOCA Code*

21. Although the Roosevelt product is visually similar to the Merchant & Evans product, only the Merchant & Evans product has been tested to demonstrate compliance with the BOCA Code.

22. The BOCA Code requires that standing seam roofs must have a wind-uplift rating. In order to receive this rat-

ing, a roof must be subjected to the UL580 Test. This test is performed only by Underwriters Laboratories, Inc. ("UL"). UL has not preformed the UL580 Test on the Roosevelt roofing system.

23. The BOCA Code also requires that roofs must have a fire rating. In order to receive this rating, a roof must be subjected to the E–108 fire rating test which is also performed by UL. UL has not preformed the E–108 Test on the Roosevelt roofing system.

24. The Roosevelt standing seam roof has passed the ASTM 330 modified wind-uplift test.

25. The Merchant & Evans roof has been subjected to and passed the UL580 wind up-lift test, the ASTM 330 modified wind-up lift test, and the E–108 fire rating test.

*The Brochure*

26. In December, 1990, Kenneth Parish ("Parish"), Vice President of Roosevelt, designed and prepared a brochure which was used in connection with the marketing of the Roosevelt standing seam roofing system (the "Brochure").

27. The Brochure employs a drawing in connection with the sale of the Roosevelt standing seam roofing system. This drawing is virtually identical to a drawing which appears on the front cover of Merchant & Evans' Design Guide, Edition 3. The two drawings depict roofing in approximately the same size, shape, and perspective.

28. The Brochure employed a side view diagram which illustrated the profile of a roofing panel. The side view diagram illustrates the unique Trade Dress.

29. The Brochure has been widely distributed for the purpose of marketing the Roosevelt products identified as CF12SS, CF16SS, CF18SS and CF24SS.

30. The roofing depicted in the Brochure is not the roofing manufactured by Roosevelt but at the angle and distance employed appears similar to a Merchant & Evans' Zip–Rib roof.

*The Trademark*

31. Since at least 1965, the registered trademark, Zip–Rib, has been used continuously in connection with this roofing system. Merchant & Evans is the owner of United States Trademark Registration No. 807142 which is listed on the Principal Register of the United States Patent and Trademark Office.

32. In June, 1990, Roosevelt adopted a logo which consisted of a large "Z" in addition to the words "Roosevelt Building Products."

33. The defendant's logo consists of one word, "Roosevelt," preceded by a stylized letter "Z".

34. The plaintiff's trademark consists of two words, "Zip" and "Rib" joined by a hyphen.

35. The term "zip," as used in the plaintiff's trademark, is not arbitrary, but evocative of the zippering process used to join the panels.

36. The "Z" logo and the Zip–Rib trademark are so similar in appearance so that both marks evoke thoughts of the "zippering" process used in connection with the installation of the unique metal roofing system.

37. Roosevelt's "Z" logo is substantially similar to the Zip–Rib logo.

38. RBP is using the "Z" logo in connection with the sale of its metal roofing system which is identical in appearance to the system sold by Merchant & Evans under the registered trademark Zip–Rib.

39. RBP's continued use of the logo that is substantially similar to Merchant & Evans' "Zip–Rib" mark will impair the value of Merchant & Evans' reputation and good will.

*Trade Secret*

40. Kenneth Parish ("Parish"), Vice President of Roosevelt, worked for Roosevelt Building Products from 1967 through 1985.

41. From 1985 through 1987 Parish worked for Merchant & Evans Industries, Inc. which was owned then by the Long Organization.

42. Parish held the title of "Operations Manager" at Merchant & Evans. Parish's job responsibilities made him thoroughly familiar with the Zip–Rib product.

43. Parish has, through the course of his career, developed an expertise in standing seam roofing systems.

44. In his career, Parish has developed great expertise in standing seam roofs in general and Zip–Rib's standing seam roof in particular.

45. In early 1987, Morin contacted Parish while he was employed by Merchant & Evans. Morin offered Parish a position with RBP.

46. In late 1987, Parish's employment with Merchant & Evans was terminated. Shortly thereafter Parish accepted a position with Morin at Roosevelt.

47. During 1990, Morin sought to expand Roosevelt's existing product line to include a standing seam roofing system. To accomplish this expansion, Morin consulted with Parish.

48. Morin requested that Parish design a standing seam roofing system which employed a trapezoidal profile. Parish rejected this request. Paris recommended the Zip–Rib product because it was the best in terms of engineering and function.

49. As a result of this conversation, Morin directed Parish to intentionally copy Zip–Rips unique Trade Dress in the production of the RBP standing seam roof marketed under the name CF12SS. RBP also markets its standing seam roof in three other widths under the designations CF16SS, CF18SS and CF24SS.

50. Parish knowingly and intentionally designed the CF12SS, CF16SS, CF18SS and CF24SS to copy exactly the Zip–Rib Trade Dress.

## DISCUSSION [1]

### 1. Preliminary Injunction

In *Sullivan v. Pittsburgh*, 811 F.2d 171 (3d Cir.1987), *cert. denied*, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987), the Third Circuit set forth the elements a plaintiff must prove in order to obtain a preliminary injunction:

(1) [P]laintiffs are likely to succeed on the merits;

(2) plaintiffs are subject to irreparable harm *pendente lite;*

(3) defendants will not suffer substantial harm from the grant of an injunction; and

(4) the public interest requires that plaintiffs be accorded relief.

*Id.* at 181 (citing *Constructors Ass'n of W. Pa. v. Kreps,* 573 F.2d 811, 815 (3d Cir. 1978)), *cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987). In addition, the adverse party must be given notice before a preliminary injunction may be issued. Fed.R.Civ.P. 65(a)(1). Under this standard, a plaintiff's right to relief on the merits need not be wholly without doubt. *Punnett v. Carter,* 621 F.2d 578, 583 (3d Cir. 1980). Instead, the Court need only determine whether the plaintiff has a fair or reasonable probability of success on the merits. *Moteles v. University of Pennsylvania,* 730 F.2d 913, 919 (3d Cir.1984), *cert. denied,* 469 U.S. 855, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984). A preliminary injunction can be granted "[o]nly if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief...." *Opticians Association of America v. Independent Opticians of America,* 920 F.2d 187, 192 (3d Cir.1990).

The application of the standards is somewhat different in a trademark infringement or unfair competition case. As stated in *Fotomat Corp. v. Photo Drive–Thru, Inc.,* 425 F.Supp. 693, 711 (D.N.J.1977):

A plaintiff who has demonstrated [trade] mark infringement and unfair competition faces the probability of lost trade and appropriation of its good will. The damages in such a case are by their very nature irreparable and not susceptible of adequate measurement. *Tafal, S.A. v.*

---

**1.** To the extent that the "Discussion" portion of this decision contains findings of fact and/or conclusions of law in addition to those set forth under such headings, they shall be deemed to be a part of the respective findings of fact and/or conclusions of law.

Products International Co., 186 U.S.P.Q. 545, 548 (D.N.J.1975), aff'd, 529 F.2d 495, 497 (3d Cir.1976). Plaintiff's lack of ability to control the nature and quality of [goods] provided under an infringing [trade]mark, even if defendant matches the high quality of plaintiff's [goods], constitutes irreparable injury.

Courts have readily granted preliminary relief in trademark and unfair competition cases. *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152 (3d Cir.1984); *American Diabetes Assoc. v. National Diabetes Association*, 533 F.Supp. 16 (E.D.Pa.1981), *aff'd* 681 F.2d 804 (3d Cir.1982); *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 215 U.S.P.Q. 610 (D.N.J.1981), *modified and aff'd*, 685 F.2d 78 (3d Cir.1982); *Chips 'N Twigs, Inc. v. Chip–Chip, Ltd.*, 414 F.Supp. 1003 (E.D.Pa.1976); *Villager, Inc. v. Dial Shoe Co.*, 256 F.Supp. 694 (E.D.Pa.1966); *Coca–Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183 (E.D.N.Y.1972); *Masterpiece of Pennsylvania, Inc. v. Consolidated Novelty Co.*, 368 F.Supp. 550 (S.D.N.Y.1973); *Waterman–Bic Pen Corp. v. Beisinger Industries Corp.*, 321 F.Supp. 178 (S.D.N.Y.1970); *Trak Inc. v. Benner Ski KG*, 475 F.Supp. 1076 (D.Mass.1979).

## 2. Likelihood of Success on the Merits

### A. *False Designation of Origins*

Merchant & Evans contends that Roosevelt has violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125 (the "Act"),[2] by attempting to "palm off" its standing seam roofing system as plaintiff's. The claim is based on two allegations: (1) that defendant's product brochure uses drawings and photographs which are substantially similar to drawings and photographs used in plaintiff's brochure; and (2) that the "bulb and hook"[3] design of the seam are a trade dress.

Under § 43(a) of the Lanham Act the design features of a useful article may qualify for trade dress protection. 15 U.S.C. § 1125(a). Protection of trade dress serves two competing interests. In the Act, Congress has attempted to balance free and unlimited trade against the consumer need to be protected from deception.[4] Judge Learned Hand explained in

---

**2.** Section 43(a) provides:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, on any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or delivered the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by the use of any such false description or representation.

15 U.S.C. § 1125(a).

**3.** The terms "bulb and hook," and "ball and hook," refer to the profile of the roofing panel seam. See appendix for graphic representation.

**4.** *See also,* L.B. Burgunder, *Product Design protection After Bonito Boats: Where it Belongs and How it Should Get There,* 28 Am.Bus.L.J. 1, 4 (1990). Professor Burgunder notes:

One hazard of absolutely free competition is that manufacturers that invest in product quality may have difficulty establishing a customer base, and indeed may have trouble remaining viable. This can occur because of low-cost imitators depriving customers of a ready means for locating the quality product that they desire. Under these circumstances, the quality producer may not sell sufficient merchandise to cover its higher levels of overhead, while the imitator earns excess returns. When granted appropriately, protection of identification symbols and characteristics solves this dilemma without creating any economic inefficiencies. Exclusivity promotes investments in goodwill because consumers interested in quality can easily locate goods manufactured by quality producers and distinguish those of competitors. Likewise, such exclusivity reduces the search costs of consumers, thereby raising their welfare. Thus, the protected characteristic is valuable to the claimant not because consumers prefer that characteristic, but because they prefer the goods in which it resides. Under these circumstances, protection can only be socially beneficial.

The analysis changes, however, when the relevant consumers are more motivated to buy the goods of the claimant than those of competitors because they prefer the protected characteristics of the claimant's goods. Under these circumstances, the claimant has a protected competitive advantage over its competitors and will earn supranormal profits.

*Crescent Tool Co. v. Kilborn & Bishop Co.*, 247 F. 299 (2d Cir.1917):

> [T]he plaintiff has the right not to lose his customers through false representations that those are his wares which in fact are not, but he may not monopolize any design or pattern, however trifling. The defendant, on the other hand, may copy plaintiff's goods slavishly down to the minutest detail: but he may not represent himself as the plaintiff in their sale.

*Id.* at 301.

In the Third Circuit, to establish a claim for unprivileged imitation of a product's appearance under section 43(a) of the Lanham Act, the plaintiff must show:

> (1) that the imitated feature is nonfunctional, (2) that the imitated feature has acquired a "secondary meaning," and (3) that consumers are likely to confuse the source of the plaintiff's product with that of defendant's product.

*American Home Products Corp. v. Barr Laboratories, Inc.*, 834 F.2d 368, 370 (3d Cir.1987) (citing *American Greetings Corp. v. Dan–Dee Imports, Inc.*, 807 F.2d 1136, 1141 (3d Cir.1986).

### i. Functionality

■ The first element which must be established by the plaintiff is that the alleged trade dress is not functional in nature. The rationale for the functionality limitation was explained in *In re Morton–Norwich Products, Inc.*, 671 F.2d 1332, 1336 (CCPA 1982):

> It has as its genesis the judicial theory that there exists a fundamental right to compete through imitation which can only be *temporarily* denied by the patent or copy right laws:

> > The result is a decrease in net social welfare. Therefore, a product characteristic should not be protected by the trademark system whenever the characteristic itself increases the value of the product more than a host of alternative characteristics could serve to benefit competitors. In other words, a manufacturer should not be entitled to trademark protection of a product characteristic whenever the manufacturer might earn supranormal returns from the protection.

*Id.* at 4–5 (footnotes omitted).

if one manufacturer should make an advance in effectiveness of operation, or in simplicity of form, or in utility of color; and if that advance did not entitle him to a monopoly by means of a machine or process or a product or a design patent; and if by means of unfair trade suits he could shut out other manufacturers who plainly intended to share in the benefits of unpatented utilities ... he would be given gratuitously a monopoly more effective than that of the unobtainable patent in the ratio of eternity to seventeen years.

*Id.* (quoting *Pope Automatic Merchandising Co. v. McCrum–Howell Co.*, 191 F. 979, 981–82 (7th Cir.1911).

The Supreme Court has explained that:

> By applying [trade dress] to goods produced by one other than the [trade dress] owner, the infringer deprives the owner of the good will which he has spent energy, time and money to obtain.... At the same time, the infringer deprives consumers of their ability to distinguish among the goods of competing manufacturers.

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 854 n. 14, 102 S.Ct. 2182, 2188 n. 14, 72 L.Ed.2d 606 (1982) (holding that the color of prescription drug is "functional" when it helps elderly consumers to differentiate medication).[5]

A finding that the design aspect has a function precludes trade dress protection. Nevertheless, if the design element has a secondary meaning, the defendant may be required to take measures to avoid confusion. The Third Circuit has explained:

> When a feature or combination of features is found to be functional, it may be

---

**5.** *See also,* L. Hefter, *Protection of Product Configurations in the United States,* 295 PLI/Pat 113 (1990).

> The requirement that product configurations be legally non-functional to be protected under the trademark law is not mandated by statute, but is a public policy created by the courts in order to avoid a conflict between the trademark and unfair competition laws and the patent law.

*Id.* at 315.

copied and the imitator may not be enjoined from using it, even if confusion in the marketplace will result. Nevertheless, if the functional feature or combination is also found to have acquired secondary meaning, the imitator may be required to take reasonable steps to minimize the risk of source confusion. *American Greetings*, 807 F.2d at 1141.

A variety of approaches to functionality have developed among the Circuit Courts in the United States.[6] The principle broadly stated is that "useful features, and not features which serve merely to identify, are considered functional." *Warner Bros. v. Gay Toys, Inc.*, 724 F.2d 327, 332 (2d Cir.1983).

In the Third Circuit, the concept of functionality was articulated in *Keene Corp. v. Paraflex Industries, Inc.*, 653 F.2d 822 (3d Cir.1981). In *Keene*, the Court of Appeals reviewed a District Court's denial of relief to a corporation which manufactured outdoor wall-mounted illuminators. The court specifically rejected the "aesthetic value" approach used by the Ninth Circuit[7] looking instead to the utility of the feature. The court stated:

the inquiry should focus on the extent to which the design feature is related to the utilitarian function of the product or feature. When the design itself is not significantly related to the utilitarian function of the product, but is merely arbitrary, then it is entitled to protection as a design trademark if it has acquired a secondary meaning.

*Id.* at 825. The Third Circuit's utilitarian test thus focuses on the extent to which the design feature is related to the utilitarian function of the product.

In this case the design element over which the plaintiff seeks trade dress protection is the "bulb and hook" seam profile. The standing seam metal roofing systems which the plaintiff and defendant corporations manufacture consist of metal panels joined together by a crimped or "zipped" seam. The plaintiff seeks trade dress protection over the profile of that seam as viewed "end-on."

■ In the Third Circuit, the plaintiff bears the burden of establishing the absence of functionality in a claim arising under Section 43(a) of the Lanham Act. *American Greetings Corp.*, 807 F.2d at 1141. ("To establish unprivileged imitation, whether of a single feature or a trade dress combination of features, it must be shown that the feature or all combination of features imitated is non-functional."); *accord Textron, Inc. v. U.S. International Trade Com.*, 753 F.2d 1019, 1025 (Fed.Cir. 1985); *Kwik–Site Corp. v. Clear View Mfg. Co.*, 758 F.2d 167 (6th Cir.1985); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531 (11th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987).

The plaintiff relies upon the definition of trade dress articulated in *Tootsie Roll Industries, Inc. v. Sathers, Inc.*, 666 F.Supp. 655 (D.Del.1987), which described trade dress as "a unique nonfunctional aspect of a product which serves to identify a product from other similar products, which may be protected under Section 43(a) of the Lanham Act...." *Id.* Plaintiff argues that rounded shape of the seam is entitled to trade dress protection since it is nonfunctional and has acquired a secondary meaning associating it with the plaintiff corporation.

■ Plaintiff argues that the roofing seam profile is arbitrary. While admitting that the roofing seam is itself functional, the plaintiff argues that the profile of the seam is a nonfunctional design element which was arbitrarily chosen. The plaintiff contends that the seam profile is non-func-

---

**6.** For a discussion of the various approaches adopted throughout the United States, see J. Dabney, *Unfair Competition After Bonito Boats*, 341 ALI–ABA 47 (1989).

**7.** In *Pagliero v. Wallace China Co.*, 198 F.2d 339 (9th Cir.1952), the Ninth Circuit developed a test for functionality that looked to the competitive advantage that a feature gave a product in the

marketplace. It stated, "If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright." *Id.* at 343. *See also, Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769 (9th Cir.1981).

tional since it "is not significantly related to the utilitarian function of the product, but merely arbitrary...." *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 81 (3d Cir.1982).

The defendant argues that the shape of the seam serves a function and is therefore not eligible for trade dress protection. The defendant attempts to substantiate this claim in a number of ways. Defendant argues that the expired patent held by the plaintiff in connection with the standing seam roofing system, discloses that the seam is functional in every respect. The patent expired on April 4, 1984, and thus, the functional aspects once exclusively enjoyed by Merchant & Evans, are now in the public domain.[8] The profile of the roofing seam, defendant contends, is one of these functional design elements.

Defendant contends that the patent describes the bulb and hook seam as functional in every aspect. A review of the patent, however, reveals the defendant's contention is unavailing. To the extent that a specific shape for the seam profile is discussed in the patent, it appears to intend a variety of shapes for the seam profile. The patent states:

> Each flange **15** has at its upper end a cylindrical or tubular bead **17**. Each flange **16**, in the assembled ceiling structure, has a tubular socket sleeve **18** of *cylindrical or equivalent nestable configuration* slightly larger in diameter than the bead, and with its inner surface being in close-coupled contact with the outer surface of bead **17**.

Patent 3,312,028 at 2, col. 3 (emphasis added). The drawing referenced in this passage appears below:

This drawing and the associated text clearly indicate that the patent does not ascribe a function to the unique Merchant & Evans trade dress, but rather refers to the shape of the standing seam in a generic manner (i.e., cylindrical or equivalent nestable configuration).

Defendant also asserts that the plaintiff's advertising literature makes a similar claim of functionality as to the seam. This advertising literature, the defendant argues, constitutes further evidence of the functionality of the seam profile. In *American Greetings Corp.*, 807 F.2d at 1141, the Third Circuit opined that "If the marketer of a product advertises the utilitarian advantages of a particular feature, this constitutes strong evidence of its functionality." Here, the Zip–Rib advertisement brochure states as follows:

---

**8.** In *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118, the Supreme Court noted:

> the federal patent scheme creates a limited opportunity to obtain a property right in an idea. Once an inventor has decided to lift the veil of secrecy from his work, he must choose between the protection of a federal patent, or the dedication of his idea to the public at large. As Judge Learned Hand once put it: "[I]t is a condition upon the inventor's right to a patent that he shall not exploit his discovery competitively after it is ready for patenting; he must content himself with either secrecy or legal monopoly."

*Id.* 109 S.Ct. at 977 (quoting *Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.,*

153 F.2d 516, 520 (2d Cir.) *cert. denied,* 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615, reh'g denied, 328 U.S. 881, 66 S.Ct. 1364, 90 L.Ed. 1648 (1946)). The Court further explained:

> [The inventor] may keep his invention secret and reap its fruits indefinitely. In consideration of its disclosure and the consequent benefit to the community, the patent is granted. An exclusive enjoyment is guaranteed him for seventeen years, but upon expiration of that period, the knowledge of the invention inures to the people, who are thus enabled without restriction to practice it and profit by its use.

*Id.* 109 S.Ct. at 977 (quoting *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 186–187, 53 S.Ct. 554, 557, 77 L.Ed. 1114 (1933)).

**Rib durability**

This field formed closure is superior to snap-on seams and snap-in clips because the joint is more resistant to distortion from uplift pressure and therefore more reliable in holding strength.

\* \* \* \* \* \*

**Weathertightness**

The flat pan and vertical ribs do not require the massive eave closures of trapezoidal configurations and are more easily sealed at penetrations.

\* \* \* \* \* \*

**Appearance**

The generous radius of the rounded rib profile avoids paint damage by the field closure operation. Its (sic) curved surface allows panels to spread to absorb normal construction variations yet maintain a more uniform shadow line appearance than possible with flat surfaces on the ribs.

(Defendant's Exhibit 4 at 3.)

These passages also fail to suggest a functionality for the standing seam profile. The first two passages do not refer to the asserted trade dress. The first passage refers to the advantages of "zippered" roofing over snap-on seams or snap-in clips. The passage does not refer to the bulb-and-hook seam profile which the plaintiff asserts as trade dress. The second passage also refers to other aspects of the roofing panel. The flat pan and vertical ribs referred to in this portion of the advertisement is distinct from the bulb-and-hook.

The third passage describes the aesthetic advantages of rounded seams over flat seams. This passage also does not refer specifically to the bulb-and-hook design of the Zip–Rib system, but to rounded profiles generally. At the hearing, the plaintiff's expert Harold Lictman, an architect, explained the aesthetic advantage of the Merchant & Evans rounded seam from an architectural prospective as follows:

Well, first of all, most of the other panels are not two and half inches high. In a place where you wish to use a high-profile roof to increase the shadow that's cast on the roof, for instance, that's

something desirable. The fact that it presents a unique shape allows it to be seen in places where it may be visible to the public and present another aesthetic that's not available from other manufacturers.

Q. Are you or are you not saying that the way a system looks is important to the architect?

A. Absolutely.

(N.T. 5–3, p. 65).

Under the Third Circuit's holding in *Keene*, 653 F.2d at 825, the aesthetic appeal of a design feature cannot be construed as functional. In *American Greetings Corp.*, the Third Circuit explained that rather than an aesthetic appeal, "a feature must have a significant relation to the utilitarian function of the product before it could be declared functional." 807 F.2d at 1142. Thus, there is no evidence that the bulb-and-hook design profile of the standing seam roof is functional.

ii. Secondary Meaning

Merchant & Evans argues that since it has been the exclusive possessor and user of the unique bulb-and-hook trade dress for over twenty-five years and has achieved "enormous success" as the source of the Zip–Rib roofing system, the bulb-and-hook trade dress has clearly achieved secondary meaning.

■ To establish secondary meaning, the plaintiff must show that the primary significance of its trade dress is "to identify the source of the product rather than the product itself." *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d at 82 (3d Cir. 1982). (Quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982)). The plaintiff can establish the significance of the trade dress through reliance on image advertising and promotion when, as here, the advertising and promotional material features the trade dress itself. *Contour Chair Lounge Co. v. True Fit Chair, Inc.*, 648 F.Supp. 704, 710 (E.D.Mo.1986); *Pennwalt Corp. v. Zenith Laboratories, Inc.*, 472 F.Supp. 413, 203 U.S.P.Q. 52, 53 (E.D.Mich.1979), *app. dismissed*, 615 F.2d 1362 (6th Cir.1980).

■ Where a trade dress is distinctive and nonfunctional, it is unnecessary to show more than that the trade dress has been associated with a single producer for a significant period. *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 936 (7th Cir.1989), *cert. denied*, 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1536 n. 13 (11th Cir.1986); *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 608 (7th Cir. 1986).

Here, Merchant & Evans has been the exclusive user of the non-functional trade dress for over twenty-five years. Over the period of its exclusive use, Merchant & Evans has used a variety of promotional and advertising materials. The defendant offers no evidence to rebut the secondary meaning claim.

### iii. Likelihood of Confusion

■ In *American Greetings Corp.*, the Third Circuit explained:

> Trade dress is a complex composite of features and the law of unfair competition in respect to trade dress requires that all of the features be considered together, not separately.

807 F.2d at 1141 (citations omitted).

Moreover, a lower standard for "likelihood of confusion" is applied where a newcomer to an area already occupied by a long-established entity is the alleged violator. The Third Circuit uses the phrase "possibility of confusion" to describe this standard. *See Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1065 (3d Cir.1991). "This legal conclusion requires the district court to determine what market is relevant to the [plaintiff] Corporation's claim...." *Id.* at 1065. Thus, the Third Circuit has held that:

> Generally, if the overall impression created by marks is essentially the same, "it is very probable that the marks are confusingly similar." Where the owner of the trade mark and the infringer "deal in competing goods or services, the court need rarely look beyond the mark itself. In those cases the court will generally examine the registered mark ... and compare it against the challenged mark.

Proof of actual confusion in not necessary; likelihood is all that need be shown.

*Opticians Assoc. of America*, 920 F.2d at 195.

In the present case, the Roosevelt product is indistinguishable from the Merchant & Evans product. There is no visual difference. Moreover, Roosevelt and Merchant & Evans target their sales efforts to the same market. Based upon the nearly identical products and the testimony of knowledgeable persons who were unable to distinguish between the products, this Court concludes that likelihood of confusion obtains.

The plaintiff also asserts a related claim regarding the defendant's advertisement brochure. Plaintiff claims that the defendant used photographs of a product other than their own in their advertising brochure. In so doing, the plaintiff contends that Roosevelt attempted to pass off its competitors' products.

Here, having found that the roofing systems cannot be visually distinguished even from a relatively close inspection, there is little doubt that the market will be confused by the distant depictions represented in the photographs. The plaintiff has a reasonable probability of success on the merits.

### B. *Trademark Infringement*

■ The plaintiff alleges that the "Z" logo used by the defendant infringes the plaintiff's "Zip–Rib" trademark. The defendant contends that the "Z" logo used by the defendant corporation is a representation of the signature used by the corporation's founder. The defendant argues that the "Z" logo placed upon the roofing panels by Roosevelt and the labels glued to the panels bearing the product's origination sufficiently ensure that the market place will not be confused as to the origin of the product.

To be successful on the trademark claim, the plaintiff must establish that:

> (1) the marks are valid and legally protectable; (2) the marks are owned by the

plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services.

*Opticians Association of America,* 920 F.2d at 192 (*citing Pedi–Care, Inc. v. Pedi–Care Nursing Inc.,* 656 F.Supp. 449, 453 (D.N.J.1990); *Holiday Inns, Inc. v. Trump,* 617 F.Supp. 1443, 1464 (D.N.J.1985)).

The plaintiff asserts that the trademark at issue in the present case is "strong" within the meaning of the test articulated in *J.B. Williams.* A mark is "strong" if it is arbitrary, fanciful or suggestive. *J.B. Williams Co. v. Le Conté Cosmetics,* 523 F.2d 187, 192 (9th Cir.1975); *see also Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175 (9th Cir.1988). A weak mark is one which "is a meaningful word in common usage, or is merely a suggestive or descriptive trademark." *Century 21,* 846 F.2d at 1179. Stated another way, the test of descriptiveness is whether the word as used conveys to the consumer the characteristics, functions, uses or qualities of a product or service. *Blumenfeld Dev. Corp. v. Carnival Cruise Lines, Inc.,* 669 F.Supp. 1297, 1318 (E.D.Pa.1987); *Victoria Station, Inc. v. Clarefield, Inc.,* 458 F.Supp. 199, 202 (W.D.Pa.1978).

In this case the plaintiff avers that the trademark "Zip–Rib" is not descriptive, but arbitrary and fanciful. Plaintiff establishes the requisite similarity in sound meaning or appearance between the alleged infringer and the plaintiff's mark. The Third Circuit has held:

> When comparing two marks each must be viewed in its entirety, although "one feature of a mark may be more significant than other features, and it is proper to give greater force and effect to that dominant feature." *Giant Food, Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565, 1570 (Fed.Cir.1983). When the dominant portions of the two marked are the same, confusion is likely. *See Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1179 (9th Cir.1988) (finding Century Investment & Realty confus-

ingly similar to Century 21 because of the dominance of the word "Century"). *Country Floors, Inc. v. Gepner,* 930 F.2d 1056 (3d Cir.1991).

A lower standard for "likelihood of confusion" is applied where, as here, a newcomer arrives to an area already occupied by a long-established entity. *Country Floors,* 930 F.2d at 1065. The plaintiff asserts that the infringing portion of the defendant's logo is the use of the letters "Z" and "R".

The plaintiff's mark consists of two words joined by a hyphen. The defendant's mark consist of one word, "Roosevelt," preceded by a stylized letter "Z". (See Appendix A). The marks use the identical letters and similar typography. Thus, the plaintiff establishes the requisite similarities between the two marks.

## C. *Trade Secret*

Count III of the amended complaint alleges that the defendant has violated common law principles which prohibit the disclosure of trade secrets which were gained as a result of former employment. In support of this claim plaintiff avers that former employees of the plaintiff, now employees of the defendant, have improperly used customer lists, vendor lists, budgets, proposed projects, bidding procedures, written specifications of component parts and methods of roofing assembly which were developed by the plaintiff.

At the hearing, Parish admitted that the Roosevelt roofing product was reversed engineered. He stated that he took a sample of the Merchant & Evans panel to various tool and die makers who used computer aided techniques to produce dies which would work on the Roosevelt die press.

## D. *Unfair Competition*

■ Under the New Jersey law of unfair competition, there are two relevant torts actions for unfair competition: passing off one's products as those of another, and unprivileged imitation. *SK & F Co. v. Premo Pharmaceutical Laboratories, Inc.,* 625 F.2d 1055, 1064 (3d Cir.1980). The "the

New Jersey Courts define these two torts in roughly the same manner as did the First Restatement of Torts." *Id.* at 1062.

Under the New Jersey law the elements for an unfair competition claim are similar to the First Restatement formulation described in § 711 (1938). This section described a cause of action against:

One who—

(a) fraudulently markets his goods or services as those of another, or

\* \* \* \* \* \*

(c) markets goods with an unprivileged imitation of the physical appearance of another's goods is liable to the other for the relief appropriate under [the ensuing Restatement rules with regard to the calculation of damages].

Restatement of Torts § 711 (1938).

As set forth above, the defendant has intentionally copied the unique non-functional trade dress of the plaintiff. Thus, Roosevelt's use of a confusingly similar trade dress constitutes unfair competition under New Jersey law.

### 3. Irreparable Harm

"Irreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it." *Opticians Assoc.*, 920 F.2d at 195. Generally, the Third Circuit has held that when a mark is the plaintiff's trademark which has become so identified with the plaintiff that its use impinges upon the reputation of the plaintiff, then irreparable harm is done. *Id.* Thus, the "key in these cases ... [is the] lack of control which potentially might result in a damaged reputation." *Id.*

In the present case, the defendant has appropriated the trade dress and infringed upon the trademark of the plaintiff. As noted above, likelihood of confusion in the present case is high since the plaintiff has operated in the market for a number of years and has developed a reputation as the sole supplier of roofing panels bearing the distinctive trade dress. "[W]here the plaintiff makes a strong showing of likelihood of confusion, irreparable harm injury follows as a matter of course." *Id.* Ac-

cordingly, this Court finds that the plaintiff has met the burden of establishing irreparable harm.

### 4. Balancing of Hardships

The infringing standing seam profile, is one of over seventy-five roofing seam profiles which the defendant sells. The plaintiff, however, sells only twelve different seam profiles. By virtue of the defendant's marketing of a product intentionally copied from the plaintiff, the plaintiff has lost control over its reputation and the goodwill of its customers. This loss of reputation and goodwill outweighs any monetary claim of hardship which the defendant might suffer. *See Wesley–Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862, 867 (7th Cir.1983). Accordingly, the equities of the present case require the issuance of the preliminary injunctive relief.

### 5. Public Interest

"Public interest can be defined in a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." *Opticians Assoc.*, 920 F.2d at 197. (Citing 2 *McCarthy*, § 30:21). Justice Frankfurter made the following observation in *Mishawaka Rubber & Woolen Mfg. v. S.S. Kresge Co.*, 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942):

The protection of trade-marks is the law's recognition of the psychological function of symbols. It if is true that we live by symbols, it is no less true that we purchase goods by them. A trade-mark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same—to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trade-mark

owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress.

*Id.* at 205, 62 S.Ct. at 1024.

Having established that a likelihood of confusion is created by the concurrent use of the trade mark and trade dress at issue in the present action, this Court finds that the public interest would best be served by the issuance of a preliminary injunction.

## CONCLUSIONS OF LAW

1. Jurisdiction in this action is based upon the Lanham Act, 15 U.S.C. § 1121, pursuant to 28 U.S.C. § 1331, and the supplemental jurisdiction of the court pursuant to 28 U.S.C. § 1367.

2. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) since the defendant has transacted or conducted business in this district, and the causes of action arose in part in this district.

3. In order to obtain a preliminary injunction, plaintiff must establish:

(1) [P]laintiffs are likely to succeed on the merits;

(2) plaintiffs are subject to irreparable harm *pendente lite;*

(3) defendants will not suffer substantial harm from the grant of an injunction; and

(4) the public interest requires that plaintiff be accorded relief.

*Opticians Association of America v. Independent Opticians of America,* 920 F.2d 187, 192 (3d Cir.1990).

4. A plaintiff's right to preliminary injunctive relief on the merits need not be wholly without doubt. *Punnett v. Carter,* 621 F.2d 578, 583 (3d Cir.1980). Instead, the Court need only determine whether the plaintiff has a fair or reasonable probability of success on the merits. *Moteles v. University of Pennsylvania,* 730 F.2d 913, 919 (3d Cir.1984), *cert. denied,* 469 U.S. 855, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984).

5. A preliminary injunction can be granted "[o]nly if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary re-

lief...." *Opticians Association of America,* 920 F.2d at 192.

6. Patent, trademark and copyright rights all exist independent of each other, and "the presence or absence of one does not automatically preclude protection under another. A thing may be in the 'public domain' for one area of law, but not for the others." *Nabisco Brands, Inc. v. Conusa Corp.,* 722 F.Supp. 1287, 1292 (M.D.N.C.1989), (quoting 1 J. McCarthy, *Trademarks and Unfair Competition* § 6.1). *See also In re Mogen David Wine Corp.,* 328 F.2d 925, 51 CCPA 1260, 140 USPQ 575 (1964) (patent rights are separate and distinct from those relating to trademarks).

7. Section 43(a) of the Lanham Act provides trade dress for design features that are not useful or functional. 15 U.S.C. § 1125(a).

8. To establish a claim for unprivileged imitation of a product's appearance under section 43(a) of the Lanham Act, the plaintiff must show:

(1) that the imitated feature is non-functional, (2) that the imitated feature has acquired a "secondary meaning," and (3) that consumers are likely to confuse the source of the plaintiff's product with that of defendant's product.

*American Home Products Corp. v. Barr Laboratories,* 834 F.2d 368, 370 (3d Cir. 1987) (citing *American Greetings Corp.,* 807 F.2d at 1141).

9. When the design itself is not significantly related to the utilitarian function of the product, but is merely arbitrary, then it is entitled to protection as a design trademark if it has acquired a secondary meaning. *Keene Corp. v. Paraflex Industries, Inc.,* 653 F.2d 822 (3d Cir.1981).

10. Useful features, and not features which serve merely to identify, are considered functional. *Warner Bros., Inc. v. Gay Toys, Inc.,* 724 F.2d 327, 332 (2d Cir. 1983).

11. A feature is not functional merely because it makes the product more attractive to consumers. *American Greetings Corp.,* 807 F.2d at 1142.

12. A feature must have a significant relation to the utilitarian function of the product before it could be declared functional. *Id.*

■ 13. The plaintiff bears the burden of establishing the absence of functionality in a claim arising under Section 43(a) of the Lanham Act. *Id.* at 1141; accord *Textron, Inc. v. U.S. International Trade Com.,* 753 F.2d 1019, 1025 (Fed.Cir.1985); *Kwik–Site Corp. v. Clear View Mfg. Co.,* 758 F.2d 167 (6th Cir.1985); *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531 (11th Cir.1986).

14. The plaintiff's standing seam roof profile is not functional in itself, but merely incidentally functional to the roofing system as such.

■ 15. To establish secondary meaning, the plaintiff must show that the primary significance of its trade dress is "to identify the source of the product rather than the product itself." *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.,* 685 F.2d at 82 (quoting *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982)).

16. The plaintiff can establish the significance of the trade dress through reliance on image advertising and promotion when the advertising and promotional material feature the trade dress itself. *Contour Chair Lounge Co. v. True Fit Chair, Inc.,* 648 F.Supp. 704, 710 (E.D.Mo.1986); *Pennwalt Corp. v. Zenith Laboratories,* 472 F.Supp. 413, 203 U.S.P.Q. 52, 53 (E.D.Mich.1979), *app. dismissed,* 615 F.2d 1362 (6th Cir.1980).

17. RBP's copying and appropriation of Merchant & Evans' trade dress and trademark in direct competition with Merchant & Evans, amounts to unfair competition and trademark infringement.

18. A lower standard for "likelihood of confusion" is applied where a newcomer to an area already occupied by a long-established entity is the alleged violator. The Third Circuit uses the phrase "possibility of confusion" to describe this standard. *Country Floors,* 930 F.2d at 1065.

19. If the overall impression created by marks is essentially the same, it is very probable that the marks are confusingly similar.

20. Proof of actual confusion is not necessary; likelihood of confusion is all that need be shown. *Opticians Assoc. of America,* 920 F.2d at 195.

21. Merchant & Evans Registration No. 807,142 for "ZIP–RIB" is incontestable under Section 15 of the Lanham Act, 15 U.S.C. § 1065. The Supreme Court has elaborated on the great strength of an incontestable registration in *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).

■ 22. Registration of a mark by the Patent and Trademark Office on the Principal Register, as in the case of Merchant & Evans' registration, is *prima facie* evidence of validity, see quotation of Section 7(b) of the Lanham Act in paragraph 64 hereof.

23. The overall impression created by the marks in the present case is essentially the same. Thus, likelihood of confusion is present.

24. To be successful on the trademark claim, the plaintiff must establish that:

(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services.

*Opticians Association of America,* 920 F.2d at 192 (*citing Pedi–Care, Inc. v. Pedi–Care Nursing Inc.,* 656 F.Supp. 449, 453 (D.N.J.1987); *Holiday Inns, Inc. v. Trump,* 617 F.Supp. 1443, 1464 (D.N.J.1985)).

25. The test for determining likelihood of confusion, was articulated in *J.B. Williams Co. v. Le Conté Cosmetics,* 523 F.2d 187, 191 (9th Cir.1975). In that case, the court required consideration of six factors:

(1) the strength of the marks;

(2) the similarity in appearance, sound, and meaning;

(3) the class of goods in question;

(4) the marketing channels;

(5) evidence of actual confusion; and

(6) evidence of the wrongful intention of the defendant.

26. A prospective purchaser, familiar with Merchant & Evans' products, could reasonably but mistakenly assume that RBP's roofing system bearing its infringing trade dress and trade mark is made by a company related to or affiliated with the source of products bearing Merchant & Evans' Trade Dress and trade mark.

27. Confusion is likely where, as here, the products of Merchant & Evans and RBP are identical.

28. The plaintiff has established likelihood of confusion.

29. Under New Jersey law, there are two relevant tort actions for unfair competition: passing off one's product as those of another, and unprivileged imitation. *SK & F Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, 1064 (3d Cir. 1980).

30. "[T]he New Jersey Courts define these two torts in roughly the same manner as did the First Restatement of Torts." *Id.* at 1062.

■ 31. A cause of action exists under New Jersey law against one who (1) fraudulently markets his good or services as those of another, or (2) markets goods with an unprivileged imitation of the physical appearance of another's goods.

32. The defendant's use of confusingly similar trade dress constitutes unfair competition under New Jersey law.

33. The plaintiff has met the burden of establishing irreparable harm.

34. The loss of goodwill outweighs any monetary claim of hardship which the defendant might suffer. Merchant & Evans has a reputation for excellence. RBP, by adopting the distinctive Trade Dress of Merchant & Evans, has attempted to arrogate to itself Merchant & Evans' reputation, and thus, RBP has threatened Merchant & Evans with immediate and irreparable harm in the event there are any problems associated with RBP or its RBP' roof system product.

■ Having found that the plaintiff is likely to succeed on the merits of the case; that it will be irreparably harmed if the defendant's actions go unchecked; that the harm to the plaintiff caused by defendant's actions outweighs the harm to defendant caused by the issuance of injunctive relief; and that the interests of the public will be furthered by the issuance of such relief, the plaintiff's motion for preliminary injunction will be GRANTED.

APPENDIX A