MERCHANT & EVANS, INC.

v.

ROOSEVELT BUILDING PRODUCTS COMPANY, INC., Appellant.

ROOSEVELT BUILDING PRODUCTS COMPANY, INC., Counter-Claimant,

v.

MERCHANT & EVANS, INC., Counter-Defendant.

No. 91-1773.

United States Court of Appeals, Third Circuit.

Argued Feb. 28, 1992.

Decided May 14, 1992.

Rehearing Denied June 5, 1992.

Robert W. Hayes, (argued), Cozen & O'Connor, Philadelphia, Pa., for appellant.

Arthur H. Seidel, (argued), Nancy Rubner–Frandsen, Seidel, Gonda, Lavorgna & Monaco, Steven R. Waxman, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for appellee.

Before: SLOVITER, Chief Judge, SCIRICA and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this trademark infringement action, Roosevelt Building Products appeals from the district court's entry of a preliminary injunction in favor of Merchant & Evans, Inc. Because we believe Merchant has not made the requisite showing of a reasonable likelihood of success on the merits, we will vacate and remand.

### I.

Merchant and Roosevelt both manufacture and sell aluminum roofing panels. Merchant brought this action as a result of Roosevelt's copying of Merchant's long-length, concealed fastener metal roofing system (also known as a "standing seam" metal roofing system), which is marketed under the registered trademark "Zip–Rib."

The standing seam metal roof was introduced in the 1960's. It consisted of flat panels having raised edges, which were affixed to the building without penetrating the exposed panel surfaces. The standing seam roof was more durable and more watertight than its predecessors.

On April 4, 1967, Kaiser Aluminum Company obtained a patent for a new "structural" standing seam roofing product, which, unlike previous standing seam roofs, could be applied directly over steel and did not require plywood solid decking. The panels had two and one-half inch standing seams which could be joined together without penetrating the panels or utilizing exposed fasteners; the edges of the seams were crimped together by a special automatic "zippering" tool, which itself was patented. These improvements were significant in that they increased watertightness by obviating the need for holes in the panels. By eliminating exposed fasteners, the invention also increased durability by allowing the panels to move across, as well as up and down, the roof.

The statement of claim that accompanied Kaiser's patent application described the innovation as follows:

> Each flange 15 has at its upper end a cylindrical tubular bead 17. Each flange 16, in the assembled ceiling structure, has a tubular socket sleeve 18 of cylindrical or equivalent nestable configuration slightly larger in diameter than the bead 17, and with its inner surface being in close-coupled contact with the outer surface of bead 17. The coupling is sufficiently close to be substantially watertight.

This design, as used in Merchant's roofing system, has come to be known as the "bulb & hook" configuration. The name derives from the appearance of the seam's profile after it has been "zippered" together.

Kaiser marketed its new roofing system under the name "Zip–Rib," and obtained a trademark upon that name. It manufactured and marketed the product through its wholly owned subsidiary, Zip–Rib, Inc.

In 1981, Merchant & Evans Company purchased Zip–Rib, Inc. It operated Zip–Rib, Inc. as a separate company until 1987, when Merchant & Evans Company and Zip–Rib, Inc. went into bankruptcy. At that time, James Buck, a former owner of Merchant & Evans Company, formed Merchant & Evans, Inc., and purchased Zip–Rib, Inc. Merchant has manufactured and marketed the Zip–Rib roofing system since 1987.

Roosevelt was founded in 1984 by Roosevelt Morin; at that time, it was known as Cold Form Industries. In 1987, that company began manufacturing metal

wall and roof panels. In June 1990, Cold Form Industries changed its name to Roosevelt Building Products,[1] and adopted a logo containing the word "Roosevelt" above the "tail" of a stylized letter "Z," with "Building Products" appearing below the tail of the "Z."

In 1987, Morin hired Kenneth Parish to be Roosevelt's Vice President of Engineering. Parish and Morin had previously worked together over a twenty-five year period at Morin's former company, but when Morin sold his ownership interest in that company, Parish went to work for Zip–Rib, Inc. Buck fired Parish on the day Merchant purchased Zip–Rib, and Morin hired Parish to work at Roosevelt.

Roosevelt entered the standing seam roofing market in 1988. At that time, Roosevelt manufactured and marketed a non-structural standing seam roofing panel. Prior to Roosevelt's entry into the *structural* standing seam roofing market, Morin and Parish debated what type of seam to use. Morin favored a trapezoidal seam (the only type of structural standing seam other than Zip–Rib's cylindrical seam currently on the market), whereas Parish had designed his own configuration. Morin asked Parish what was the best-engineered product then on the market, and Parish named Zip–Rib. In August 1990, Morin decided to use Zip–Rib's cylindrical configuration for Roosevelt's structural standing seam roofing panels. Roosevelt admits that it had the Zip–Rib standing seam roofing panel "reverse engineered," that it intentionally copied that product, and that the Roosevelt product and Zip–Rib are virtually identical.[2]

In December 1990, Parish designed and prepared a brochure that was used in connection with the marketing of Roosevelt's roofing system. The brochure employed a drawing similar to that appearing on Merchant's *Design Guide, Edition 3*. It also employed a side-view diagram. The roofing system depicted in the brochure is not Merchant's roofing system (which was not yet in production when the brochure was put together), but appears similar to a Zip–Rib roof.

In this trademark infringement action, Merchant alleges: (1) false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988); (2) trademark infringement in violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (1988); (3) improper use of trade secrets; and (4) non-privileged imitation in violation of New Jersey law. Merchant sought a preliminary injunction restraining Roosevelt from using the "bulb & hook" cylindrical standing seam in its metal roofing products; from using depictions of Merchant's products in its advertising; and from using its corporate logo, which allegedly infringed Merchant's "Zip–Rib" logo.

The district court held that: (1) Merchant was likely to succeed on the merits of its claims; (2) Merchant would suffer irreparable harm in the absence of a preliminary injunction; (3) the harm to Merchant outweighed any harm to Roosevelt; and (4) the public interest would be served by entry of a preliminary injunction. Accordingly, the district court granted Merchant's motion for preliminary injunction.

## II.

The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1292(a)(1).

■ In ruling on a motion for a preliminary injunction, the district court must consider: (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 191–92 (3d Cir.1990). The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all

---

1. For the sake of convenience, we will refer to Cold Form Industries, even before the name change, as Roosevelt.

2. Zip–Rib's patent had expired on April 4, 1984.

four factors favor preliminary relief. *Id.* at 192.

 The decision whether to enter a preliminary injunction is committed to the sound discretion of the trial court, and will be reversed "only if the court abused its discretion, committed an obvious error in applying the law, or made a serious mistake in considering the proof." *Loretangeli v. Critelli,* 853 F.2d 186, 193 (3d Cir. 1988). However, "[a]lthough terms of an injunction are normally reviewed for abuse of discretion, any determination that is a prerequisite to the issuance of an injunction ... is reviewed according to the standard applicable to that particular determination." *John F. Harkins Co. v. Waldinger Corp.,* 796 F.2d 657, 658 (3d Cir.1986), *cert. denied sub nom. TWC Holdings, Inc. v. Waldinger Corp.,* 479 U.S. 1059, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987).

### A. § 43(a) Claim

 The district court held that the "bulb and hook" profile of the Zip–Rib roofing seam was "trade dress" protectible under § 43(a) of the Lanham Act. Although " 'trade dress' has traditionally referred to the packaging or labeling of a product," *Stormy Clime Ltd. v. Progroup, Inc.,* 809 F.2d 971, 974 (2d Cir.1987), " 'trade dress' in its more modern sense [may] refer to the appearance of the [product] itself." *American Greetings Corp. v. Dan–Dee Imports, Inc.,* 807 F.2d 1136, 1140 (3d Cir.1986) (quoting *Ideal Toy Corp. v. Plawner Toy Mfg. Co.,* 685 F.2d 78, 80 n. 2 (3d Cir.1982)). In order to qualify for trade dress protection, the plaintiff must show:

> (1) that the imitated feature is non-functional, (2) that the imitated feature has acquired a "secondary meaning," and (3) that consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product.

*American Home Prods. Corp. v. Bar Lab., Inc.,* 834 F.2d 368, 370 (3d Cir.1987) (citing

*American Greetings Corp.,* 807 F.2d at 1141).

 In this case, the crucial issue is functionality. The district court's findings of secondary meaning and likelihood of confusion appear to be logical results of the seventeen-year monopoly Zip–Rib enjoyed under its utility patent.[3] Although courts are split as to who bears the burden of proof on the issue of functionality, this court places the burden on the plaintiff to prove non-functionality. *American Greetings Corp.,* 807 F.2d at 1141. "Proof of nonfunctionality generally requires a showing that the element of the product serves no purpose other than identification." *SK & F, Co. v. Premo Pharmaceutical Lab., Inc.,* 625 F.2d 1055, 1063 (3d Cir.1980).

The rationale for the functionality limitation on trade dress protection "has as its genesis the judicial theory that there exists a fundamental right to compete through imitation of a competitor's product, which right can only be *temporarily* denied by the patent or copyright laws." *In re Morton–Norwich Prods., Inc.,* 671 F.2d 1332, 1336 (C.C.P.A.1982) (emphasis in original). To allow indefinite trademark protection of product innovations would frustrate the purpose of the limited duration of patents to foster competition by allowing innovations to enter the public domain after seventeen years. As the United States Supreme Court stated nearly a century ago:

> It is self evident that on the expiration of a patent the monopoly created by it ceases to exist, and the right to make the thing formerly covered by the patent becomes public property. It is upon this condition that the patent is granted. It follows, as a matter of course, that on the termination of the patent there passes to the public the right to make the machine in the form in which it was constructed during the patent.

*Singer Mfg. Co. v. June Mfg. Co.,* 163 U.S. 169, 185, 16 S.Ct. 1002, 1008, 41 L.Ed. 118 (1896). "For almost 100 years it has been

---

**3.** Some courts, and at least one commentator, have questioned whether "someone [can] develop secondary meaning during a period when the lack of competition is due to some other

form of intellectual property protection." John B. Pegram, *Trademark Protection of Product and Container Configurations,* 81 Trademark Reporter 1, 26 (1991) (footnote omitted).

well established that in the case of an expired patent, the federal patent laws *do* create a federal right to 'copy and to use.' " *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 165, 109 S.Ct. 971, 984, 103 L.Ed.2d 118 (1989) (emphasis in original).

■ "Many [courts] follow the utilitarian view of functionality: particular elements of overall trade dress are functional if they are essential to the product's purpose or use or if they affect the cost or the quality of the product." 1 Jerome Gilson, *Trademark Protection and Practice*, § 702[7], at 7-76-81 (1991) (citing cases); *see Inwood Lab., Inc. v. Ives Lab., Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982) ("In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."). This court, in *United States Golf Ass'n v. St. Andrews Systems*, 749 F.2d 1028, 1033-34 (3d Cir.1984) (citations omitted), stated:

The "functionality" of a feature of a product or service cannot be determined by the application of a mechanical test. Although various forms of the inquiry have been articulated, the essence of the question is whether a particular feature of a product is substantially related to its value *as a product or service, i.e.,* if the feature is a part of the "function" served, or whether the primary value of a particular feature is the identification of the provider.... Several courts have noted that the key policy served by barring the use of functional features for identification is the policy favoring competition, and that the "functionality" inquiry must be addressed in light of this policy.

In "a leading case on the procedure for determining functionality of product configurations," *see* Pegram, *supra* n. 3, at 10,

the Court of Customs and Patent Appeals distinguished between " 'functional' shapes that are never capable of being monopolized, even when they become 'distinctive of the applicant's goods,' and shapes which can be monopolized because they are of such an arbitrary nature that the law does not recognize a right in the public to copy them, even if some incidental function is associated with them." *In re Deister Concentrator Co.*, 48 C.C.P.A. 952, 289 F.2d 496, 503 (1961). In *Morton–Norwich*, the Court of Customs and Patent Appeals held that a product design was functional if it was "the best or one of a few superior designs available." 671 F.2d at 1341. *See* Jay Dratler, Jr., *Trademark Protection for Industrial Designs*, 1988 U.Ill.L.Rev. 887.[4]

Under the *Morton–Norwich* test, which one commentator has characterized as "liberalizing" trademark protection of product configurations, Pegram, *supra* n. 3, at 12, Zip-Rib's roofing seams would appear to be functional. There was testimony by Kenneth Parish, which appears to be uncontroverted, that there are currently only two basic types of structural standing seams: the cylindrical configuration used by Zip-Rib and Roosevelt, and "what they call a trapezoidal standing seam product." Thus, it appears that the Zip-Rib seam is "the best or one of a few superior designs available." *See Morton–Norwich*, 671 F.2d at 1341.

■ This court, like the *Morton–Norwich* court, has held product configurations to be functional when only a limited number of viable alternatives exist. In *Keene Corp. v. Paraflex Industries, Inc.*, 653 F.2d 822 (3d Cir.1981), we addressed a case in which defendant marketed an "outdoor wall-mounted luminaire which [was] nearly identical to and was admittedly copied from" plaintiff's product. It was conceded in that case that plaintiff's unit had devel-

---

**4.** In that article, the author states:

[T]he best approach to defining the standard for functional features relies on the concept of features "dictated by function." Properly understood, this approach asks not whether the feature is the *only* way to implement the desired utility, but whether the class of alternative designs that, by virtue of their utilitarian characteristics, have the same competitive potential is small or large. If that class is small, the feature is functional. If it is large, the feature is nonfunctional.

*Id.* at 946 (emphasis in original).

oped "secondary meaning in that it had come to be recognized in the industry as [plaintiff's] product." *Id.* at 823–24. The district court found that there were approximately twelve to fifteen designs on the market from which to choose, and that granting one manufacturer the exclusive rights to any of them posed a danger to competition. Based on these findings, the district court held that plaintiff's design was functional, and we affirmed. *Id.* at 827.

Similarly, in *American Greetings Corp. v. Dan–Dee Imports, Inc.*, 807 F.2d 1136, we affirmed the district court's finding that the "tummy graphics" on plaintiff's line of plush toy teddy bears were functional, because they "contribute[d] to the effectiveness and performance of Care Bears as plush toy teddy bears ... [by serving] 'the purpose of communicating the particular personality of each of the Care Bear characters, and ... convey[ing] an emotional message through such personality.'" *Id.* at 1142 (quoting district court opinion). In support of its holding, this court quoted the following language from *Keene Corp.*, which we find equally applicable here:

> [M]erely because there are other shapes and designs "which defendant could use and still produce a workable" product, the design is not thereby non-functional.... Because "the policy predicate for the entire functionality doctrine stems from the public interest in enhancing competition," however, a court may also consider "'whether prohibition of imitation by others will deprive the others of something which will substantially hinder them in competition.'"

*Id.* (quoting *Keene Corp.*, 653 F.2d at 827) (other citations omitted). *See also W.T. Rogers Co. v. Keene*, 778 F.2d 334, 340 (7th Cir.1985) (quoting *In re Bose Corp.*, 772 F.2d 866, 872 (Fed. Cir.1985)) ("'If the feature asserted to give a product distinctive-

ness is the best, or at least one, of a few superior designs for its *de facto* purpose, it follows that competition is hindered,' and trademark protection will be denied.").

▇▇▇ The cylindrical seam of the Zip–Rib roof serves several utilitarian functions: (1) it allows the roofing panels to be tightly crimped together with the zippering tool; (2) when crimped together, it forms a capillary groove which provides ninety percent of the watertightness of the system; (3) by producing a hinging motion, it allows the panel to move slightly upward in response to wind uplifts, reducing the risk of blow-offs; and (4) the roundness of the seam reduces the possibility of paint cracking. In view of this, Merchant has not carried its burden of demonstrating "that the element of the product serves no purpose other than identification." *SK & F, Co.*, 625 F.2d at 1063. Although the Zip–Rib seam is undoubtedly "distinctive of the applicant's goods," it appears to be one of those "'functional' shapes that are never capable of being monopolized." *Deister*, 289 F.2d at 503.[5]

Merchant's strongest argument in support of the district court's finding of a § 43(a) violation is the fact that "[t]he roofing depicted in [Roosevelt's] Brochure is not the roofing manufactured by Roosevelt but at the angle and distance employed appears similar to a Merchant & Evans' Zip–Rib roof." *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co.*, 774 F.Supp. 1467, 1471 (E.D.Pa.1991). As Professor Gilson has stated, "[t]he use by defendant of a photograph of his competitor's product in his own advertising in commerce is ordinarily a 'false representation' within, and hence actionable under, Section 43(a)." Gilson, *supra*, § 7.02[6] at 7–53–54 (citing cases). *See, e.g., Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210 (8th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976) (photographs of plain-

---

**5.** Even if a product configuration is functional, courts may require that goods "be labeled or that other precautionary steps be taken to prevent customers from being misled as to the source." *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 232, 84 S.Ct. 784, 789, 11 L.Ed.2d 661 (1964). However, all of Roosevelt's catalogues state that "Products inside this catalogue are manufactured by Roosevelt Building Products," and labels are affixed to all samples of Roosevelt's roofing panels shipped to customers that read, "manufactured by Roosevelt Building Products." At this stage of the proceedings, such labeling would appear to be sufficient.

tiff's trailer); *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649 (3d Cir. 1954) (defendant's advertisement of its inferior $6.95 dress with a photograph of plaintiff's $17.95 dress). *But see Vibrant Sales, Inc. v. New Body Boutique, Inc.*, 652 F.2d 299 (2d Cir.1981), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982) (no § 43(a) violation where defendants used a photograph of plaintiff's waist-reducing belt in their advertising).

Here, however, even assuming Roosevelt depicted a Zip–Rib panel in its brochure,[6] we do not believe this gives rise to a § 43(a) violation. The district court found that "[d]ue to the visual similarity of the two products, the Roosevelt roofing panel cannot be distinguished from the Zip–Rib product by a person observing the products, even at a close distance." 774 F.Supp. at 1470. Because the appearance of the two products is identical, it is difficult to see how Roosevelt's alleged use of a Zip–Rib roof in its photograph could be misleading. *Accord Vibrant Sales*, 652 F.2d at 304 (emphasis added) ("One who uses a photograph of his competitor's unpatented and untrademarked product to advertise his own wares may be guilty of false representation *if the product pictured is not identical to the one he is prepared to deliver.*").

Therefore, we believe the Zip–Rib roofing seam configurations here are functional, and that the district court's finding that Merchant had demonstrated a reasonable probability of success on its § 43(a) claim was based on a clearly erroneous finding of non-functionality.

### B. § 32(1) Claim

Merchant also alleges that the "Z" logo used by Roosevelt infringes its "Zip–Rib" trademark.[7] In *Country Floors, Inc. v. Partnership of Gepner & Ford*, 930 F.2d 1056, 1063 (3d Cir.1991), we held that "[a] person is liable to the owner of a mark

under § 32 of the Lanham Act if he uses a confusingly similar mark. The marks need not be identical, only confusingly similar."

The district court held here:

The plaintiff's mark consists of two words joined by a hyphen. The defendant's mark consists of one word, "Roosevelt," preceded by a stylized letter "Z".... The marks use the identical letters and similar typography. Thus, the plaintiff establishes the requisite similarities between the two marks.

774 F.Supp. at 1479. We do not believe these similarities alone will support the entry of a preliminary injunction.

As Roosevelt points out, "neither the same words, symbols, style of printing or color scheme are utilized. The only similarity [between the two marks] is that the letters 'Z' and 'R' are used in both." Furthermore, as the United States Court of Appeals for the First Circuit has stated:

[D]isplay of the manufacturer's name is not always determinative of the confusion issue. In the case of a relatively high-priced, single-purchase article, however, "there is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed."

*Fisher Stoves, Inc. v. All Nighter Stove Works*, 626 F.2d 193, 194–95 (quoting *Bose Corp. v. Linear Design Lab., Inc.*, 467 F.2d 304 (2d Cir.1972)) (other citations omitted).

Generally, the decision which type of roof to install on a building is made by architects or contractors, and the decision which roofing subcontractor to hire is made by either the general contractor or, less frequently, the architect. Bids solicited from roof installation companies ordinarily identify, among other things, the manufacturer of the roofing product to be used. It is well established that buyer sophistication militates against a finding of likelihood of confusion. *See e.g., Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931

---

**6.** The district court did not expressly find that the brochure depicted a Zip–Rib panel; it found only that "[t]he roofing depicted in [Roosevelt's] Brochure is not the roofing manufactured by Roosevelt but at the angle and distance employed appears similar to a Merchant & Evans' Zip–Rib roof." 774 F.Supp. at 1471.

**7.** The disputed logos are appended to this opinion.

F.2d 1100, 1111 (6th Cir.1991) ("When the relevant buyer class is composed of such professional purchasers the likelihood of confusion is lower"); *Dresser Indus., Inc. v. Heraeus Engelhard Vacuum, Inc.,* 395 F.2d 457, 462 (3d Cir.), *cert. denied,* 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968) (citations omitted) ("Whether the class of buyers is sophisticated is a matter of importance in deciding the question of probable confusion.").

In *Perini Corp. v. Perini Construction, Inc.,* 915 F.2d 121 (4th Cir.1990), the United States Court of Appeals for the Fourth Circuit addressed a case in which the district court had found a likelihood of confusion based on the facts that: (1) both plaintiff and defendant were in the construction business; (2) both called themselves "Perini"; (3) both firms used the same marketing channels and occasionally bid for the same jobs; and (4) there was evidence of actual confusion, including " 'receiving the other's invoices, misdirection of correspondence about bids, one company being blamed for the other's labor problems, the naming of the wrong company on legal pleadings, and the confusion that the two companies are actually branch offices of the other.' " *Id.* at 127 (quoting district court opinion). In reversing the district court's grant of summary judgment for plaintiff, the *Perini* court stated:

> Although no one factor is dispositive of the "likelihood of confusion" inquiry, the sophistication and expertise of the usual purchasers can preclude any likelihood of confusion among them stemming from the similarity of trade names.... The district judge below erred because he made no inquiry into the sophistication of the ordinary consumer of construction services—most likely a highly trained procurement professional whose sensitivity is heightened by the responsibility of sensibly spending millions of dollars.

*Id.*

▮ Here, we believe the level of sophistication of the architects and contractors who specify or order metal roofing panels and the fact that the Roosevelt logo prominently features the words "Roosevelt Building Products" were relevant factors that the district court should have weighed in considering the likelihood of confusion. As we stated in *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277 (3d Cir.), *cert. denied sub nom. Altran Corp. v. Ford Motor Co.,* — U.S. —, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991), the likelihood of confusion analysis "requires" the evaluation of a number of factors, including:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;[8] (8) the extent to which the targets of the parties' sale efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

*Id.* at 293 (citing *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir.1978)). We also noted that "some buyer classes, for example, professional buyers, or consumers of very expensive goods, will be held to a higher standard of care than others," thus reducing any likelihood of confusion. *Id.*

▮ Of course, we do not preclude the district court from finding on remand that Merchant has satisfied its burden of showing that it is entitled to a preliminary injunction on its trademark infringement claim. As this court held in *Country Floors,* 930 F.2d at 1065, when a newcomer moves into a territory of an established concern and uses a name or mark similar in

---

**8.** Of course, where, as here, the goods are competing, this factor does not apply.

some respect to that used by the established concern, "the 'likelihood of confusion standard' should be lowered to a 'possibility of confusion'" standard.

We believe the appropriate course in light of the district court's failure to give sufficient consideration to a number of relevant factors in its analysis is to remand so that the court can consider those factors in its determination of whether Merchant has shown a possibility of confusion between the marks.

### C. Trade Secrets Claim

■■ Merchant concedes that it "chose not to pursue [its trade secrets] claim at the Preliminary Injunction hearing." Roosevelt, therefore, did not submit proposed findings of fact or conclusions of law on that claim. We believe the district court's grant of a preliminary injunction on a claim that was not pursued at the preliminary injunction hearing constituted an abuse of discretion.

■■ Regardless whether the claim was pursued below, the district court's finding that Merchant had shown a reasonable probability of success on its trade secrets claim strikes us as erroneous. The district court appears to have based its finding on Parish's admission "that the Roosevelt roofing product was reversed [sic] engineered." 774 F.Supp. at 1479. However, as the Supreme Court has stated:

> A trade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture.

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974) (footnote omitted) (*quoted with*

*approval in Bonito Boats*, 489 U.S. at 160, 109 S.Ct. at 982).[9]

### D. State Law Unfair Competition Claim

The district court held that "Roosevelt's use of a confusingly similar trade dress constitutes unfair competition under New Jersey law." 774 F.Supp. at 1480. The parties, however, do not address this claim in their briefs, but confine their analysis to the federal claims.

We believe this claim is likely to fail for substantially the same reasons as the § 43(a) claim. In fact, the state claim is even less likely to succeed than the federal claim, because of the line of United States Supreme Court decisions holding various state unfair competition laws pre-empted by the federal patent laws. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989); *Compco Corp. v. Day–Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964). As the Supreme Court has stated:

> [B]ecause of the federal patent laws a State may not, when the article is unpatented and uncopyrighted, prohibit the copying of the article itself or award damages for such copying.

*Sears, Roebuck & Co.*, 376 U.S. at 232–33, 84 S.Ct. at 789–90.

### III.

Because these issues are likely to arise upon remand, we set forth some of the applicable legal principles. Although federal trademark protection, unlike state prohibitions on unfair competition, cannot be pre-empted by the federal patent laws, there is an undeniable tension between trademark protection of product configurations and the federal patent laws. *See generally* Dratler, *supra.* Although courts may not be able to eliminate this

---

**9.** Roosevelt also disputes whether Parish, who was employed by Zip–Rib, Inc. prior to its bankruptcy but never by Merchant (which purchased Zip–Rib, Inc. out of bankruptcy) is a "former employee" of Merchant for purposes of its trade secret claim. Because Merchant elected not to pursue its trade secret claim at the preliminary injunction hearing and because the reverse engineering in which Roosevelt engaged appears to have been lawful, we need not address this question.

tension entirely, a heightened awareness of the policies underlying the two doctrines may enable us to minimize any conflict between trademark and patent principles.[10]

In order to obtain patent protection, an innovator must demonstrate that an invention or design is both novel and not "obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103 (1988). Patent protection lasts only for a limited time, after which the innovation passes into the public domain.[11]

■ By contrast, a party seeking trademark protection need only prove the distinctiveness of its mark—*i.e.*, that it is either arbitrary, suggestive, or descriptive and possessing secondary meaning. Once the requisite showing has been made, trademark protection is of infinite duration. As one court has noted:

Patents for inventions and designs are the principal means by which we protect intellectual property embodied in products. By bestowing limited periods of protection to novel, non-obvious, and useful inventions and new, original, and ornamental designs, ... the patent laws encourage progress in science and the useful arts.... Since trademark protection extends for an unlimited period, expansive trade dress protection for the design of products would prevent some functional products from enriching the public domain.

*Stormy Clime*, 809 F.2d at 978.

In *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979), the Supreme Court summarized the policies underlying the federal patent laws:

First, patent law seeks to foster and reward invention; second, it promotes disclosure of inventions to stimulate further innovation and to permit the public to practice the invention once the patent

expires; third, the stringent requirements for patent protection seek to assure that ideas in the public domain remain there for the free use of the public.

*Id.* at 262, 99 S.Ct. at 1099 (citing *Kewanee Oil*, 416 U.S. at 480–81, 94 S.Ct. at 1885–86).

In *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985) (citations omitted), the Court identified the rationale behind federal trademark protection:

The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers. National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation.

The keystone of patent law is originality. In exchange for making public an innovation in utility or design, the patent laws grant the innovator a temporary monopoly, after which the innovation passes into the public domain. *See Singer Mfg. Co.*, 163 U.S. at 185, 16 S.Ct. at 1008. If trademark law could be used to extend that monopoly indefinitely upon expiration of a patent, the compromise struck by the patent laws would be thwarted.

■ Fortunately, however, even a successful invocation of trademark protection need not produce a monopoly. The focal point of trademark law is likelihood of confusion as to the source of goods or services. 1 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 2:3, at 54 (2d ed. 1984). So long as confusion as to source is unlikely, trademark law is not offended when multiple sources offer iden-

---

**10.** *See* Dratler, *supra,* at 924 ("Although a number of courts have noticed the apparent conflict between patent law and trademark protection for industrial designs, few have stopped to analyze its severity, the differing policies underlying patent and trademark law, or the assistance

that the principles of trademark law itself may provide in resolving the apparent conflict.").

**11.** Utility patents extend for seventeen years, 35 U.S.C. § 154 (1988), and design patents extend for fourteen years. 35 U.S.C. § 173 (1988).

tical products or services.[12] *See Sno–Wizard Mfg., Inc. v. Eisemann Prods. Co.,* 791 F.2d 423, 428 (5th Cir.1986) (finding no § 43(a) violation where, "although the design and the configuration of the machines were identical except for the identifying language on the door, other factors negated any likelihood of confusion"). In many cases, differences in labeling or packaging will suffice to prevent a likelihood of confusion between substantially identical products. *See, e.g., Freixenet, S.A., v. Admiral Wine & Liquor Co.,* 731 F.2d 148 (3d Cir.1984); *Litton Sys., Inc. v. Whirlpool Corp.,* 728 F.2d 1423 (Fed. Cir.1984); *Bose Corp. v. Linear Design Lab., Inc.,* 467 F.2d 304 (2d Cir.1972).

"Trademark infringement occurs only when the use sought to be enjoined is likely to confuse purchasers with respect to such things as the product's source, its endorsement by the plaintiff, or its connection with the plaintiff." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 388 (5th Cir.1977); *see* Dratler, *supra,* at 931 ("Under trademark law ... the gist of infringement is not the making, use, or sale of the product containing the accused mark, but the likelihood of confusion in the marketplace"); 2 McCarthy, *supra,* § 23:1, at 42–43 (citations omitted) (" 'Likelihood of confusion' is the basic test of both common-law trademark infringement and federal statutory trademark infringement."). Therefore, courts should tailor trademark remedies to decrease the likelihood of confusion without unnecessarily inhibiting competition.[13]

Here, the district court's order enjoined Roosevelt from, *inter alia,* "[u]sing the Bulb and Hook trade dress in its standing seam roof system, including but not limited to RBP roofing panel numbers CF12SS, CF18SS and CF24SS." Because the purpose of trademark law is solely to prevent confusion, and not to afford a monopoly to the markholder, "[i]n general, there is no need to stop the production and distribution of the accused products altogether." Dratler, *supra,* at 931 (citations omitted); *see Keene Corp.,* 653 F.2d at 827–28 (affirming district court's order requiring only that defendant's copies of plaintiff's product be labeled "Made in Taiwan," and "Not a Product of [Plaintiff]"). "[I]t is hard to quarrel with the view that a copyist can, by appropriate advertising, avoid confusion as to source, regardless of congruence of design." *Dratler, supra,* at 930 n. 234; *see Keene Corp.,* 653 F.2d at 827–28. Because we hold that Merchant has failed to demonstrate a reasonable likelihood of success on the merits of its claims, we need not address in detail the specific provisions of the preliminary injunction. However, we hope the foregoing discussion will prove helpful in the proceedings on remand.

## IV.

Because we believe the district court erred in finding that Merchant had demonstrated "a reasonable probability of success on the merits,"[14] *see Moteles v. University of Pennsylvania,* 730 F.2d 913, 919 (3d Cir.), *cert. denied,* 469 U.S. 855, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984), we will vacate the order of the district court, and remand *for further proceedings consistent with this opinion.*

---

**12.** Of course, if a product feature is deemed functional, even a likelihood of confusion will not give rise to a trademark violation. 1 McCarthy, *supra,* § 7:26.

**13.** As noted above, one of the goals of trademark law is to promote competition. *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 193, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985); *see also* Dratler, *supra,* at 926 n. 210 ("It is worth emphasizing that a significant purpose of trademark law is to promote, not to impede, competition, and that protecting trademarks may have procompetitive effects.").

**14.** In light of our resolution of this issue, we need not address whether Merchant has demonstrated that: (1) Merchant will suffer irreparable harm in the absence of an injunction; (2) entry of a preliminary injunction will not cause Roosevelt to suffer irreparable harm; or (3) the public interest favors preliminary injunctive relief.