Dawn **FAVIA, Wendy Schandelmeier, Kim Dalcamo, Amy Phaehler, on behalf of themselves and all similarly situated individuals, Plaintiffs,**

v.

**INDIANA UNIVERSITY OF PENNSYLVANIA, Lawrence Pettitt and Frank Cignetti, Defendants.**

**Civ. A. No. 92–2045.**

United States District Court, W.D. Pennsylvania.

Feb. 4, 1993.

Jon Pushinsky; Michael Louik, Berger Kapetan Meyers Rosen Louis & Raizman, P.C.; Edward A. Olds, Pittsburgh, PA; and Arthur H. Bryant, Washington, DC, for plaintiffs.

Donna J. McClelland, Office of Atty. Gen., Pittsburgh, PA, for defendants.

## AMENDED MEMORANDUM OPINION

COHILL, District Judge.

*Background*

Before the Court is a class action lawsuit brought by women students at Indiana University of Pennsylvania ("IUP") alleging systemic discrimination on the basis of gender in IUP's intercollegiate athletic program. The action is brought on behalf of the women athletic program participants and all present and future IUP women students or potential students who participate, seek to participate or are deterred from participating in intercollegiate athletics sponsored by IUP. The named plaintiffs had been members of the women's gymnastics and field hockey teams. The school, the school's President, Dr. Lawrence Pettit, and the Director of Athletics, Frank Cignetti are the named defendants. Pursuant to Rule 65, Fed.R.Civ.P., the plaintiffs seek a preliminary injunction to have the two teams reinstated and to prohibit the defendants from eliminating any more women's teams.

This case arises out of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. and the equal protection clause of the Fourteenth Amendment. But plaintiffs here rely solely on alleged Title IX violations as the basis for their preliminary injunction motion. They contend that IUP fostered disparities in athletic participation opportunities on the basis of gender by providing disparate levels of support to male and female athletes and by allocating athletic scholarships in a gender discriminatory way.

On October 21, 22, and 23, 1992, we conducted a preliminary injunction hearing. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, we now make the following findings of fact and conclusions of law. Pursuant to Fed.R.Civ.P. 65(a)(2), the trial of this action on the merits is hereby consolidated with the hearing on the preliminary injunction held on October 21, 22, and 23, 1992, and the Court's

Preliminary Injunction shall become a permanent injunction without further proceedings, unless the Court receives notice, by November 23, 1992, that a party wishes to introduce further evidence in support of its position.

### Findings of Fact

IUP is a university within the Pennsylvania State System of Higher Education. It is federally funded and thus subject to the mandates of Title IX. In 1990–91, IUP had 10,793 students, 4790 men and 6003 women. Thus, about 55.61 percent of the IUP student population was female at the time of the decision to cut intercollegiate athletic teams.

In 1991, IUP was faced with a budget crisis. There were substantial reductions in both state and federal aid to the school, and as a result, the university administration advised its various departments that they had to reduce their budgets, including the Department of Athletics, which was instructed to reduce its budget by $350,000.

In August 1991, an announcement was made that the women's gymnastics and field hockey teams and the men's soccer and tennis teams were going to be eliminated beginning with the 1992–93 school year. Prior to the 1991 cutback, IUP had a total of 503 athletes on its intercollegiate teams, 313 male and 190 female. The percentage of female athletes was 37.77 percent, compared to the entire female student population percentage of 55.61 percent. After these program cutbacks, including normal attrition on the football team, roughly 397 students were participating in interscholastic athletics, 248 males and 149 females, or 36.51 percent females.

IUP has three categories of sports teams: (1) intercollegiate varsity teams, which belong to the National Collegiate Athletic Association ("N.C.A.A.") and bring the school the most money and prestige of the three categories, (2) club teams, which are informal, basically student-run organizations, and (3) intramural teams, which are open to all students. Varsity teams, the "official" representative of the university, have full- and part-time coaches, designated schedules, rules and regulations. Varsity teams also have access to ice, water, storage and locker space, and have professional athletic trainers and a traveling budget for away games. They also have more funding and coaches than the intramural or club teams. At the time of the 1991 cutbacks, IUP had roughly eighteen varsity sports (half male and half female as far as numbers of teams), 18 club sports, and 44 intramural sports (19 female, 5 coed, and 20 male).

Before the cutbacks, IUP had nine men's and nine women's intercollegiate athletic teams. Because of the elimination of the four teams, IUP now has seven teams per gender.

Apparently, Mr. Frank Cignetti, the Athletic Director, believed that it was best to eliminate equal numbers of men's and women's teams, recommended this to the Athletic Policy Committee, which in turn recommended the cuts to IUP's previous president. His successor, defendant Dr. Lawrence Pettit testified at the hearing, but since he had just become president of the university on August 1, 1992, he really knew little about the factual background leading up to this case.

These teams were eliminated because they were no longer viable, according to the witnesses for IUP. Dr. David DeCoster, Vice–President of Student Affairs, cited a declining national trend in women's gymnastics and field hockey, but testified that the popularity of women's soccer is increasing. He, Mr. Cignetti, and others testified that it was the intent of the university to replace the women's gymnastic and field hockey teams with a women's varsity soccer team at sometime in the future when there was less of a financial crunch at the university. Dr. DeCoster admitted that there were no women members of the subcommittee which drafted the evaluation model of sports at IUP, nor were there women present when the Athletic Policy Committee voted to eliminate the four teams, although there may have been a female student representative.

Both sides presented an impressive array of witnesses, and we were impressed with

the candor and sincerity of all of them. There is little in dispute insofar as facts are concerned. What we really have is a difference of opinion with respect to the impact of Title IX on the situation at IUP.

The plaintiffs' case may be considered in two phases. They presented the testimony of the three female student/athlete plaintiffs concerning the effect of the elimination of the two women's teams, and they secondly presented a great deal of testimony through present and former IUP staff members and one expert witness as to the general atmosphere at IUP relative to the participation of women in athletics.

Dawn Favia, one of the student plaintiffs, was recruited to go to IUP and to participate in the gymnastics team. She had been involved in gymnastics since she was six years old. She was awarded a scholarship of $1,000 per semester as a member of the gymnastics team. She would not have gone to IUP if she had known that the gymnastics team was to be cut.

Another plaintiff, Wendy Schandelmeier, was a student "walk-on" on the gymnastics team. She had been in competitive gymnastics since the fifth grade. She has two years of eligibility remaining.

Amy Pfaehler, the last student plaintiff, was on the field hockey team. She had played at the sport since the seventh grade. When the field hockey team was eliminated, she took it upon herself to form a team. Some thirty-five women came out for it, and they created a seven game schedule for themselves, which they have been playing this year.

Kofie Montgomery, a health and physical education instructor at IUP since 1977, was the women's field hockey coach. She testified that nine other schools in the conference in which IUP competes have women's field hockey teams. She did not receive additional compensation as a coach but was relieved of teaching a two credit course in return for her services as a coach. She now keeps the field hockey uniforms for the team in the trunk of her car, because storage space has been eliminated.

The statistics speak for themselves and make a strong case for the women plaintiffs. We find that while the number of female students greatly exceeds the number of male students at IUP, roughly 55 percent to 45 percent, the percentage of female versus male athletes is quite the opposite. In 1991–92, 37 percent of all athletes were female and 63 percent were males. With the elimination of the two women's teams the percentage of women athletes dropped to 36 percent and the men increased to 64 percent.

We heard considerable testimony about the general state of IUP athletics for women. Ruth Podbielski, former associate director of athletics at IUP, retired in 1987 after 31 and a half years at IUP. The first women's varsity team, she said, was formed in 1970. Prior to that all women's teams were club teams.

When Frank Cignetti, the athletic director, came to IUP in 1982 there were ten varsity women's teams. This subsequently dropped to nine, and with the cuts under consideration here there are only seven.

According to Ms. Podbielski, who is apparently an institution herself at IUP, the women athletes and teams have generally been behind the men's in terms of priorities. She felt that Mr. Cignetti was well motivated toward all athletes and athletics (and so do we), and he made some very constructive improvements when he came to the university in 1982, but with the budget problems, the situation has deteriorated.

IUP plays in what is known as Division II in college athletics, and it is part of the N.C.A.A. For a while an organization known as the "Association of Intercollegiate Athletics for Women" or "A.I.A.W." sponsored championship meets in various women's sports. There was some fierce competition from the N.C.A.A.; eventually the A.I.A.W. lost the battle and is now defunct. This came about when the N.C.A.A. sanctioned women's championships.

The N.C.A.A. had a history of battling Title IX and lost a court case on the issue

of whether Title IX applied to college athletics.

Mr. Cignetti felt strongly that N.C.A.A. championships were much more prestigious than A.I.A.W. championships.

Although retired, Ms. Podbielski wrote a letter to the president of IUP, spoke to Dr. David DeCoster, Vice President of Student Affairs (who was also a witness), and to Frank Cignetti about the situation and warned them that she felt that the cuts were a violation of Title IX.

She cited a number of inequities at IUP. The scholarships for football and men's basketball are higher than in other sports, and this affects participation. The baseball field (for men) is kept in much better shape than the softball field (for women). At each home football game and basketball game a scholarship for tuition for one semester is raffled off. This, of course, increases student attendance at these games and heightens interest. Although the women's basketball games almost always are played immediately before the men's, the drawing for the scholarship is conducted at half time at the men's basketball games.

Ms. Podbielski was succeeded by another woman, Vivian Fuller (also a witness) as associate athletic director. Ms. Fuller left in August, 1992, and because of the budget problems, there are no plans to replace her. This leaves Mr. Cignetti and another male, who is an associate athletic director, as the two holding the top positions in the department.

At the Indiana Country Club, five members of the IUP staff have corporate memberships paid for by the university—Mr. Cignetti and four other men. Several of the male coaches receive complementary cars for their use.

Ms. Christine Grant testified as an expert in the area of equity in sports. She had been president of the A.I.A.W. and since 1973 has been the director of the Women's Athletic Program at the University of Iowa. Her conclusions, after studying the situation at IUP, were that IUP should: (i) reallocate resources; (ii) appoint a committee to draw up a five-year plan for athletics; and (iii) immediately reinstate the women's gymnastics and · field hockey teams. Ms. Grant also testified that it was good for student athletes to compete in championship meets no matter who sponsored them, or how prestigious they might be, and that whether or not it was the N.C.A.A. which sponsored them should not be a factor. We note that she had been president of the A.I.A.W., and this may have had something to do with her disdain for the N.C.A.A., but nevertheless, we were impressed with Ms. Grant's background, abilities and testimony.

In terms of student scholarships the women also fall well behind the men; in 1990–91 the university awarded $314,178 in scholarships. Of this amount, $246,755 went to men and only $67,423 to women, or 21 percent to women and 79 percent to men.

The thrust of the testimony of the witnesses for the university was that the cuts were necessitated by the budget problems, that the university had maintained equality by cutting two men's teams as well as two women's teams, and that it intended to elevate women's soccer to varsity status as soon as the budget would permit.

Dr. David DeCoster, vice president of student affairs, testified that a university committee, appointed by the former president, had thoroughly analyzed the situation, and concluded that the cuts in question would be made. Dr. DeCoster opined that to achieve total equality in sports the university would have to cut the men's teams to four.

Dr. DeCoster testified that the committee had used some twelve factors in evaluating teams, and he emphasized the importance of football and men's basketball in terms of prestige and of their being important factors in attracting the attention of potential students.

Several other members of the IUP athletic faculty also testified. Erica Renwick schedules the use of facilities and coaches softball. She was satisfied with the situation at IUP.

Frances Nee, the IUP swimming coach for both men and women for six years likewise testified to her satisfaction with IUP and agreed with Vivian Fuller that N.C.A.A. championships were more important because of their prestige. She admitted on cross-examination that she had not known that such a large percentage of scholarship funds went to men, nor had she been offered a membership at the country club.

Frank Cignetti was the last witness called by the defendants. We were impressed with his sincere interest in all athletics and with all of the athletes, male and female. Mr. Cignetti is a sensitive man, obviously between the proverbial rock and a hard place. His budget has been drastically cut; he must therefore make cuts in the athletic program, yet he is faced with the constraints of Title IX.

We are also sympathetic with the fact that the football team represents a large portion of the dominance of men's teams over female teams at IUP. Football is a high profile sport; it generates money through ticket sales and undoubtedly heightens the interest of students, alumni and potential students in the university. As a dangerous sport, it is also expensive.

Unfortunately, however, Title IX does not provide for any exception to its requirements simply because of a school's financial difficulties. In other words, a cash crunch is no excuse.

### Summary of Facts

The court finds as follows:

1. Defendants' elimination of the women's gymnastics and field hockey teams from Indiana University of Pennsylvania's intercollegiate athletic program results in a reduction of opportunities for women who wish to compete in intercollegiate athletics at IUP.

2. The opportunities to participate in intercollegiate athletics available to women at IUP are disproportionate to the number of women students attending IUP and are not substantially equal to the opportunities available to men students.

3. The plaintiffs have suffered and will continue to suffer from irreparable injury by virtue of defendants' gender discriminatory conduct.

4. Issuance of immediate relief sought by plaintiffs will restore the situation to the status quo ante litem.

5. The public interest will be advanced by the entry of an order restoring the status quo ante.

### Conclusions of Law

■ This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1341, 1343, and 2201. In ruling on a motion for a preliminary injunction, we must consider four factors: 1) the likelihood that plaintiffs will prevail on the merits of their claims, 2) the extent to which plaintiffs are being irreparably harmed, 3) the extent to which defendants will suffer irreparable harm if the preliminary injunction is issued, and 4) whether the public interest favors the entry of the preliminary injunction. *Merchant & Evans, Inc. v. Roosevelt Building Products Co., Inc.,* 963 F.2d 628 (3d Cir.1992). Only if plaintiffs produce evidence sufficient to convince us that all four factors favor preliminary relief should a preliminary injunction issue. *Id.* Plaintiffs have the burden of proof. *Opticians Association v. Independent Opticians,* 920 F.2d 187 (3d Cir.1990).

### 1. Irreparable Harm to Plaintiffs

By cutting the women's gymnastics and field hockey teams, IUP has denied plaintiffs the benefits to women athletes who compete interscholastically: they develop skill, self-confidence, learn team cohesion and a sense of accomplishment, increase their physical and mental well-being, and develop a lifelong healthy attitude. The opportunity to compete in undergraduate interscholastic athletics vanishes quickly, but the benefits do not. We believe that the harm emanating from lost opportunities for the plaintiffs are likely to be irreparable.

### 2. Irreparable Harm to Defendants

We do not believe that the defendants will be irreparably harmed if the women's field hockey and gymnastics teams are reinstated. The budget, while shrinking, has space for reallocation and cutbacks in other areas.

### 3. Probability of Success

Next, we must consider whether plaintiffs have shown that they have a reasonable probability of success on the merits of their Title IX claim. Our decision to grant the preliminary injunction is legally only a prediction about the merits of plaintiffs' case. *United States v. Local 560*, 974 F.2d 315, 330 (3d Cir.1992). We hasten to add, however, that in view of the statistical evidence produced at the preliminary injunction hearing, there is little doubt as to the outcome of any additional hearings on these issues.

■ We believe that plaintiffs have proved their case. Title IX provides a cause of action to battle discrimination based upon gender by educational institutions which receive federal funding, *Franklin v. Gwinnett County Public Schools*, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), and was intended to prevent the use of federal resources to support gender discrimination. *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). We must look to the language of Title IX of the Education Amendments of 1972:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). Federal enforcement of the statute and its regulation is within the jurisdiction of the Department of Education's Office for Civil Rights ("OCR"). OCR's policy interpretation deserves our great deference. *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Office of Civil Rights Regulations applies Title IX to interscholastic, intercollegiate, club and intramural athletics.

Education Act, 34 C.F.R. 106.41(a). Title IX and the implementing regulations can be violated without showing a specific intent on the part of the educational institution to discriminate against women. *Haffer v. Temple University*, 678 F.Supp. 517, 539 (E.D.Pa.1987).

■ The OCR policy interpretation sets out a three-pronged test for whether an educational institution complies with the duty to provide equality in its opportunities to participate in intercollegiate athletics. We must consider:

1. Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

2. Where the members of one sex have been and are underrepresented among intercollegiate athletics, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of the members of that sex; or

3. Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed.Reg. 71418 (Dec. 11, 1979). Defendants bear the burden of proof with respect to the second and third prongs. IUP is in violation of Title IX if all three prongs are answered in the negative. We find that plaintiffs have established their claim that IUP has discriminated against women athletes on the basis of gender.

### A. First Prong

We agree with the plaintiffs that IUP has failed to provide women students with opportunities to participate in Intercollegiate Athletics proportionate to the percentage of women in the undergraduate student body. Before the 1991 cuts, 37.77 percent of the intercollegiate athletes were

women, but 55.61 percent of the students were women. Once the gymnastics and field hockey teams were cut (41 women), and men's tennis, soccer and football team attrition are factored in, the percentage of women intercollegiate athletes dropped to 36.51 percent. We believe that the pre–1991 status of women's proportionality requires remedial action to correct the discriminatory effects of IUP's policies, 34 C.F.R. § 106.3(c). The 1991 cuts simply exacerbated an already existing Title IX violation.

## B. Second Prong

Defendants have failed to override the proportionality requirement by not showing a history of expanding its athletic opportunities to respond to the developing interest of its women students. 44 Fed.Reg. 71418 (Dec. 11, 1979). In the years before the 1991 cuts, IUP may be congratulated for *some* expansion of women's sports, but as the statistics show, in 1992 they have regressed. The levels of opportunities for women to compete went from low to lower, and the 1991 cuts were not responsive to the needs, interests, and abilities of with women students. Women's athletic expenditures in 1991 were $2.75 for each $8.00 spent on men's programs, women athletes received 21.46 percent of IUP's athletic scholarship funds (compared to 35 percent women participating), while only 36.51 percent of intercollegiate athlete positions were filled by women. Although it may at sometime in the future, IUP has not elevated its popular women's club soccer to a varsity status.

You can't replace programs with promises.

Defendants' counsel urges us to look to other schools' proportionality statistics, cited in numerous OCR investigations. But these cases are nonpersuasive because the universities under investigation had not cut back on women's teams. IUP has.

## C. Third Prong

Although the university has continued to honor its scholarship commitments to women athletes whose teams have been elimi-

nated and offered to assist athletes in transferring to other schools, defendants have not shown that this fully and effectively accommodates the interests and abilities of women at IUP. Nor does the promise of a women's varsity soccer team at some indeterminate future time meet the interests and abilities of female athletes.

We are not persuaded by IUP's defenses. "[F]inancial concerns alone cannot justify gender discrimination." *Haffer*, 678 F.Supp. at 530. Men's athletics have reaped the benefits of favoritism. Defendants also claim that because the N.C.A.A. sponsors no gymnastics championship, the elimination of gymnastics was justified. We disagree. *See Cook v. Colgate University*, 802 F.Supp. 737, 747 (N.D.N.Y.1992).

The gymnastic team had plenty of quality competition, as did the field hockey team. Although the field hockey team had a poor win/loss record, this probably stems from a tough conference, but even more likely is the negative effect of lack of funding, scholarships, and staff. The testimony of the named plaintiffs clearly showed an interest and commitment to their respective sports, and IUP has now denied the plaintiffs participation in their sports.

## Public Interest

Finally, our decision to grant plaintiffs' motion for a preliminary injunction must factor in the public interest in the granting of the preliminary injunction. The public has a strong interest in the prevention of any violation of constitutional rights.

In summary, the women plaintiffs merely seek what the law requires, equal athletic opportunities. We understand the fiscal constraints placed on IUP's Athletic Department, but new monies or reallocation of funds to reinstate these teams is the least the Athletic Department can do in light of its legal violations.